THE STATE EX REL. RINDER vs. GOFF, County Clerk.

*October 16—November 7, 1906*

*Supreme court: Original jurisdiction, when and how exercised: Primary elections: Right to have name on official ballot: Mandamus: Prospective official duties: Certificate of election as nominated candidate: Rights of holder: Canvassing board.*

1. Questions of title to local public office, or of performance of local official duty, though *publici juris*, are not ordinarily questions "affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people," and only in very exceptional cases will the supreme court entertain them in the exercise of its original jurisdiction.

2. But serious abstract questions as to the construction of the primary election law and the rights of one holding a regularly issued certificate of nomination, affecting the operation of the law throughout the entire state, may properly be considered as questions affecting the prerogatives of the state and the liberties of the whole people, even though they arise in a controversy as to the right to a place on the official ballot as the party nominee for a local office; and the court may properly exercise its original jurisdiction in such a case, especially where the time between the primary and the general election is so short that no authoritative decision could be reached through the exercise of the appellate jurisdiction.

State ex rel. Rinder v. Goff, 129 Wis. 668.

3. In such a case the court declines to entertain an action in equity and determine therein which person in fact received the greater number of legal votes, but directs the issuance of an alternative writ of *mandamus* for the purpose of determining only the duty of the county clerk upon the record before him as to the printing of the official ballot.

4. Although *mandamus* will not generally be available in advance of the time when the official duty in question is to be performed, yet in extreme cases the writ may issue to control the performance of prospective duties. No other remedy being available, such a case is *held* to exist as to the duty of a county clerk with respect to printing relator's name on the official ballot, where the clerk had already made his determination and might legally act at once, but was not required by law to act until some three weeks later, only four days before the election, and the writ if delayed until that time would be fruitless.

5. Under the general statutes (secs. 81–88, Stats. 1898) making the execution of certificates of election a part of the county canvass, and secs. 16, 25, ch. 451, Laws of 1903, making the provisions of those statutes applicable to primary elections, a certificate of election should be issued by the county clerk to a candidate nominated for a county office at a primary election.

6. When the vote at a primary election has been canvassed by the proper board and the proper certificate of election has been executed, the person receiving such certificate is at once in possession of the *quasi* office of nominated candidate, and has the right to have his name put on the official ballot, as against all the world, until in some proper proceeding (as by *quo warranto*) it is decided that another person was in fact nominated. No subsequent voluntary action of the canvassing board (as in re-canvassing the vote and granting a certificate to another) can deprive him of his *prima facie* right to such *quasi* office.

MANDAMUS to the County Clerk of Dane County. *Peremptory writ issued.*

At the opening of court on the 9th day of October, 1906, application was made to the court by the attorney general, on the sworn complaint or relation of *Christian F. Rinder,* for leave to commence an action in equity in this court to enjoin the defendant, as county clerk of Dane county, from printing the name of one W. S. Packard as Republican candidate for county treasurer of said county upon the official ballot for the general election in November following, and to

command him to print the name of the relator as such candidate upon such ballot. The proposed complaint or relation, after stating the official character of the defendant and the fact of the holding of a general primary election under the primary law, September 4, 1906, alleged, in substance, that the relator and W. S. Packard and one Roloff were candidates upon the primary ballot for the Republican nomination for county treasurer of said county at said primary election; that in the Third ward of the city of Madison (being one of the election precincts in said county) the relator actually received eighty-three votes, Packard forty-nine votes, and Roloff twenty-seven votes, and that the precinct inspectors so counted and announced the result and that the same so appeared upon the written tally sheet provided by the secretary of state for the purpose of computing the result, but that the inspectors, in making their written statement of the result required by the statute, by mistake certified that Packard had received eighty-three votes, Roloff forty-nine votes, and *Rinder* twenty-seven votes, and that said statement and tally sheet, as well as the ballots cast, were duly returned in a sealed package to the county clerk; that a like mistake of five votes was made in the town of Middleton, another election precinct of the county; that the county board of canvassers of said county met on September 7th following and canvassed the votes, and determined and certified, among other things, that *Rinder* had received 2,007 votes and Packard 2,000 votes at said primary, and adjourned *sine die;* that on September 19th following, the defendant, as county clerk, issued and delivered to the relator a certificate of his election as Republican candidate for county treasurer, which relator still holds; that afterwards, on September 24th, said canvassing board pretended to meet again to take further action, and passed a resolution reciting that the board had canvassed the tally sheets instead of the inspectors' certificates, that there was a discrepancy between the tally sheets and the certificates

of the inspectors, that the tally sheets show the nomination of *Rinder* and the certificates the nomination of Packard, and resolving that the certificate theretofore issued to *Rinder* be rescinded and that a certificate of election be issued to Packard, in accordance with the inspectors' certificates; that the defendant declares and threatens that he will print the name of Packard upon the official ballot and not the name of *Rinder;* that *Rinder* actually received the greater number of votes; and that the relator has no other remedy in the premises unless this court entertain the action. A temporary injunctional order was also prayed for and an ancillary writ of *certiorari* directing the defendant to certify to this court the original returns and ballots.

The court took this application under advisement, and on the 10th day of October denied the application for leave to commence an action in equity, but directed that an alternative writ of *mandamus* issue, returnable forthwith, commanding the defendant to place *Rinder's* name on the official ballot or show cause to the contrary. An ancillary writ of *certiorari* to bring up the records and ballots had previously been issued as prayed in the original relation, and the said records had been returned when the alternative writ of *mandamus* was issued.

The defendant made return to the alternative writ on October 12th, admitting the holding of the primary election, the candidacy of *Rinder* and Packard, the discrepancy between the tally sheets and the certificates from the precincts in question, the canvass of the returns by the county canvassing board, and that "said canvassing board computed the number of votes received for said *Rinder* and said Packard from the tally sheets in the first instance, with the result as alleged in said complaint." The return further admits that the board re-assembled and corrected their mistake, and determined, upon the inspectors' certificates, that Packard had received a majority of the votes, and alleges that on the 24th of Septem-

ber, 1906, he executed and delivered a certificate of nomination to Packard, which Packard still has. The return further alleges that the recount was made on advice of counsel, that Packard claims to have actually received the greater number of votes, and admits that, unless otherwise directed, he will cause Packard's name to be printed on the official ballot, and prays that the action be dismissed.

Afterwards, and before argument of the cause, both parties appeared in court by their counsel and applied for an order appointing commissioners to count the ballots actually cast. This application was also taken under advisement, and on October 15th was denied, and the following statement of the reasons for such denial was filed:

PER CURIAM. Serious questions as to the construction of the primary law and the duties of executive officers thereunder may properly be considered as questions affecting the prerogatives of the state and the liberties of the whole people, and on that account this court may properly consider them in the exercise of its original jurisdiction, because the decision of such questions necessarily prescribes a rule of conduct for all election officers in the' state, though the case in which they arise may affect only the nomination for a local office. Especially should this be so held in view of the fact that an authoritative decision of such questions could rarely be reached through the exercise of the appellate jurisdiction, on account of the shortness of the time between the primary election and the general election, when the question must be tested, if tested at all. But a controversy as to who received the most votes at a primary election for the nomination for a local office, not involving any construction of the primary law itself, is not a question affecting prerogatives of the state or liberties of the people, so as to call for the exercise of the original jurisdiction of this court. In the *Rinder Case* the question whether the certificate issued to *Rinder* or the one afterwards issued to Pack-

State ex rel. Rinder v. Goff, 129 Wis. 668.

ard by the canvassing board is controlling upon the county clerk in printing the ballots is considered a question within the original jurisdiction of this court; but this court will not go into the question as to which candidate received the most votes, either by counting the ballots or by taking other testimony. The court will confine itself to the question as to the duty of the county clerk under the primary law in view of the action of the canvassing board.

On the 16th day of October the relator moved to quash the return, and the case was argued by counsel and taken under advisement.

For the relator there was a brief signed by *Tenney, Hall & Tenney* and *Rufus B. Smith,* and the cause was argued orally by *Mr. F. W. Hall* and *Mr. Smith.* To the point that the county board of canvassers, having met pursuant to law and canvassed the returns and declared that *Rinder* had received the most votes for nomination as county treasurer, and having issued to him the certificate of his nomination, has no power to reconvene at a later date and annul the certificate and issue another to Packard, they cited McCrary, Elections (4th ed.) §§ 267–269; *Bowen v. Hixon,* 45 Mo. 340; *Gooding v. Wilson,* Dig. Elec. Cases in Congress (1871–1876) 79; *State ex rel. Biggs v. Churchill,* 15 Minn. 455; *Clark v. Buchanan,* 2 Minn. 346; *Rice v. Board of Canvassers,* 50 Kan. 149; *Rosenthal v. State Board of Canvassers,* 50 Kan. 129; *Crouse v. Nixon,* 65 Kan. 843; *State ex rel. Att'y Gen. v. Donnewirth,* 21 Ohio St. 216, 220; *State ex rel. Ingerson v. Berry,* 14 Ohio St. 315; *In re Hearst,* 183 N. Y. 274, 76 N. E. 28; *Smith v. Lawrence,* 2 S. Dak. 185, 49 N. W. 7; *Crowell v. Lambert,* 10 Minn. 369, 375; *Att'y Gen. v. Board of Co. Canvassers,* 64 Mich. 607, 611, 31 N. W. 539. The tally sheets may be considered. *State ex rel. Welty v. McFadden,* 46 Neb. 668, 65 N. W. 800.

*Ernest N. Warner,* for the defendant, contended, *inter alia,*

that the county board of canvassers had no authority under the statute to compute the number of votes cast for county treasurer except upon the certificates of the inspectors of election. Had it been discovered that they were following any other rule, this court would by *mandamus* have compelled them to make their canvass from such certificates. Sec. 16, ch. 451, Laws of 1893; secs. 76, 81 *et seq.* Stats. 1898; *Att'y Gen. ex rel. Carpenter v. Ely,* 4 Wis. 420; *Att'y Gen. ex rel. Bashford v. Barstow,* 4 Wis. 567. The court will go behind the returns. *State ex rel. Burnett v. Pierpont,* 29 Wis. 608; *State ex rel. Field v. Avery,* 14 Wis. 122; *State ex rel. Guernsey v. Meilike,* 81 Wis. 574. If the board had not corrected its error the court would direct the county clerk to print Packard's name on the ballot, as upon the record he is clearly the nominee. *People ex rel. Smith v. Pease,* 27 N. Y. 45; *People ex rel. Eastman v. Seaman,* 5 Denio, 409; *People ex rel. Yates v. Ferguson,* 8 Cow. 102; *People ex rel. Van Voast v. Van Slyck,* 4 Cow. 297; *People ex rel. Benton v. Vail,* 20 Wend. 12; *Rex v. Vice-Chancellor,* 3 Burr. 1647.

On October 18th judgment was rendered quashing the return and adjudging that the peremptory writ of *mandamus* issue. The following opinion was filed November 7, 1906:

WINSLOW, J. The importance of this case, as being the first case involving the construction of the new primary election law (ch. 451, Laws of 1903), was fully appreciated by this court from its inception. It was manifest at once that, if any remedy were to be given, it must be given quickly if it were to be effective. At the same time it was realized that the importance of the questions involved imperatively demanded deliberate and well-considered, rather than hasty, action. The court has made an earnest effort to meet these requirements, and it is the office of this opinion to make clear, if possible, the grounds upon which the several orders and the final judgment are based.

The three separate grants of jurisdiction made by sec. 3, art. VII, Const., are now well understood. They are appellate jurisdiction, which enables this court to revise finally the decisions of inferior courts in all litigation brought to it by appeal or proper appellate writ; superintending jurisdiction, for the purpose of controlling the course of ordinary litigation in all inferior courts when such courts overstep their jurisdiction or refuse to act within it and there is no other adequate remedy; and original jurisdiction, to protect the general interests and welfare of the state and its people, which is exercised by the use of the prerogative and *quasi*-prerogative writs named or referred to in the section. *Att'y Gen. v. Blossom,* 1 Wis. 317; *Att'y Gen. v. Railroad Cos.* 35 Wis. 425; *State ex rel. Fourth Nat. Bank v. Johnson,* 103 Wis. 591, 611, 79 N. W. 1081; *State ex rel. Cook v. Houser,* 122 Wis. 534, 100 N. W. 964. It is well settled, also, that this original jurisdiction was not given to this court for the primary purpose of enabling it to entertain and decide mere private or local questions, of which the circuit court has full jurisdiction, but to make it a court of first resort on all judicial questions "affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people." *Att'y Gen. v. Railroad Cos., supra.* This principle is important, and has been frequently acted upon by this court by refusing to exercise its original jurisdiction in cases involving mere private or local interests. Indeed, were it to be overlooked and the doors opened to ordinary actions, even of great importance, it seems very certain that the volume of such business would be so great as to seriously hamper, if not overwhelm, the court in its effort to perform its other constitutional duties. *In re Mielke,* 120 Wis. 501, 98 N. W. 245.

The present application, as at first made, was an application for the exercise of the last-named jurisdiction, by means of mandatory as well as restraining injunction in an action in equity, and our attention was first directed to the question whether the matters involved were such as could be properly

said to affect the sovereignty of the state, its franchises or pre-
rogatives, or the liberties of its people.   Questions of the title
to local public office, or of performance of local official duty,
though *publici juris,* are not ordinarily such questions, and
only in very exceptional cases will this court entertain them
in the exercise of its original jurisdiction.  · *Att'y Gen. v.
Eau Claire,* 37 Wis. 400; *State ex rel. Wood v. Baker,* 38
Wis. 71; *State ex rel. Cash v. Juneau Co.* 38 Wis. 554; *State
ex rel. Radl v. Shaughnessey,* 86 Wis. 646, 57 N. W. 1105;
*In re Holland,* 107 Wis. 178, 83 N. W. 319.   The ordinary
jurisdiction of the circuit court is ample for such cases.   It
did not seem that any exceptionally important circumstance
or fact was present here.  The bare question whether the name
of *Mr. Rinder* or Mr. Packard should be placed on the official
ballot was largely a personal question, important to no one ex-
cept the two gentlemen named.   In any event some person
presumably competent would be chosen treasurer, and the pub-
lic business would be transacted without perceptible differ-
ence, or, if there was any disturbance in the public business,
it would concern only the affairs of one municipality.   It was
manifestly an entirely different question from that involved
in the case of *State ex rel. Cook v. Houser,* 122 Wis. 534, 100
N. W. 964, where the question was as to the placing of the
names of an entire ticket for state officers upon the official bal-
lot, thus probably affecting governmental policies as well as
business, and hence deemed to seriously affect the liberties of
the people.   Thus it seemed to us certain that the question
whether *Mr. Rinder* or Mr. Packard received the greater num-
ber of votes at the primaries was clearly not within the lines
which have been laid down within which this court will exer-
cise its original jurisdiction.

   It appeared, however, by the relation that abstract ques-
tions were involved concerning the proper construction of the
new primary election law and the rights of one holding a reg-
ularly issued certificate of nomination, and as to such ques-

tions there were very different considerations. The primary election law was a new and important law, operative in every election precinct and county of the state, making a radical change in the conduct of all general and municipal elections, and creating a new office or *quasi* office, namely, the office of nominated candidate. Although this new office or right was one of very short duration and carried but one privilege, namely, the privilege of having the name printed properly on the official ballot, nevertheless the right was important. Evidently any serious abstract question as to the proper construction of the law clearly affected not only the local candidates between whom it might arise, but also the operation of the law throughout the entire state. Furthermore, the time within which such a question must be tested, if at all, was so brief that it would be rarely possible (except by consent) to obtain a decision thereon in a trial court and review thereof by this court before the right would be lost and a decision fruitless. These persuasive considerations impelled us to the conclusion that the court ought to exercise its original jurisdiction for the purpose of determining such questions, for the reason that they were not merely questions of local interest or local official duty, but concerned the duty of all election officers in the state, and so affected the sovereignty of the state and the liberties of the whole people.

But, if original jurisdiction were to be assumed for. this purpose, the question then presented itself whether the question as to whether *Rinder* or Packard actually received the more votes, though a mere local controversy, should not be also entertained and decided, as ancillary to the main question. The proposed action was an action in equity, and the proposed complaint alleged that *Rinder* in fact received the greater number of votes. This allegation might well be put in issue. No reason was perceived why, if the action were allowed to proceed as an action in equity, Packard should not be interpleaded for his own protection, and be entitled to

plead and prove that he himself received the greater number of votes, and thus convert the action substantially into an election contest over a nomination for a local office. If this were to be done for one it should be done for all in a similar situation, and thus the court would in effect become a tribunal for the settlement of all contests over primary nominations for all offices, state or local, or, in other words, an appellate canvassing board for the entire state. The considerations before mentioned, and which must be apparent to all, forbade such a course, and thus we reached the conclusion that, while we would entertain and decide an important question as to the construction of the primary law and the duties of local offi cials thereunder, we would not entertain or decide the question as to which of two candidates for nomination for a local office received the greater number of votes. We therefore declined to entertain the action in equity, which would necessarily open up the whole field as to the conduct of the election, the legality of the votes cast, and the number cast for each, and directed simply the issuance of an alternative writ of *mandamus,* not for the purpose of settling an election contest, for *mandamus* is not so used, but only to determine the duty of the county clerk upon the record before him as to the printing of the official ballot. By this course it seemed certain that the questions over which this court should assume original jurisdiction would be clearly presented, without embarrassment from the presence of other issues and claims not germane to the question of the proper construction of the primary law.

In so holding we are not unmindful of the general principle laid down in *State ex rel. Board of Ed. v. Hunter,* 111 Wis. 582, 87 N. W. 485, that *mandamus* will not generally be available in advance of the time when a duty is to be performed, nor of the fact that the county clerk is not required by law to print the official ballots until four days before the general election, and hence that no duty would be actually due

at the time of the issuance of the alternative writ.   But it was recognized in that case that extreme cases might well arise demanding the use of *mandamus* to control the performance of prospective duties, and it seemed to us that this was just such a case.   The act to be controlled here was necessarily required to be done within a little more than three weeks, and it might legally be performed at once.   Under the allegations of the proposed complaint or relation the county clerk had already made his determination and was threatening to carry it out.   There was no provision for a recount of the ballots by any board or officer, except in an action of *quo warranto* or other proper proceeding to contest an election; no such action or contest being then pending or practically possible within the limited available time.   Sec. 80, Stats. 1898, as amended by ch. 287, Laws of 1905.   If the relator's position was correct, the county clerk was about to disobey the law, eliminate the relator's name from the official ballot, and effectually destroy his right to have his name go before the people as a candidate.   Moreover, if the writ were delayed until four days before election it would be fruitless.   No hearing or judgment could then be obtained in time to be of any use.   Under these circumstances we found little difficulty in reaching the conclusion that an exceptional case was made, justifying, and even requiring, the use of the writ to control prospective action on the part of a public officer.   For the reasons given the court refused to entertain an action in equity which would be substantially an action to contest the election, and ordered the issuance of its alternative writ of *mandamus* to determine simply the duty of the county clerk upon the record before him, and for the same reasons the court refused the subsequent application to count the ballots.

Upon the allegations of the relation, the writ, and the return, there is no substantial contest as to the facts.   The election inspectors, according to a well-known custom, returned the tally sheets which had been furnished them, with their cer-

tified statements of results, to the county clerk. The tally sheets in two precincts did not agree with the certified statements, and the difference was such that if the tally sheet results were accepted *Rinder* was nominated, and if the certified statements were accepted Packard was nominated. The county board of canvassers duly met, canvassed the returns, discovered the discrepancies, and accepted the tally sheet results in the two precincts, declared *Rinder* nominated, and adjourned *sine die*. The county clerk issued and delivered a certificate of election to *Rinder*. Some days afterwards the board of canvassers, upon advice of counsel and of their own motion, reconvened, assumed to recanvass the vote, accepting the certified statements instead of the tally sheets, resolved that their former action be rescinded, and declared Packard nominated, and the clerk issued a certificate of election to Packard. Upon these admitted facts, in view of the absence of any statutory provision for recount of the ballots except in an election contest, and in view of the absence of contest and the apparent impossibility of the prosecution and determination of such a contest within the time available for such purpose, what name should the county clerk place upon the official ballot? This is the question presented by the motion to quash the return, and its determination requires, in the first place, consideration of the provisions of the primary election law which govern the canvass of votes. Upon this subject the law does not purport to contain a complete system of procedure, but attempts to adopt the methods provided by law for the canvass of the returns of the general election in November. Sec. 16 (ch. 451, Laws of 1903, as amended) provides that the canvass of votes shall, except as therein otherwise provided, be made in the same manner and by the same officers as the canvass of an election. It further provides, after prescribing the duties of precinct canvassers, that the "county canvass . . . shall be made by the same officers and in the manner provided in ch. 5, Stats. 1898, for the canvass

of the returns of a November election." Sec. 25 further provides:

"The provisions of the statutes now in force in relation to the holding of elections, the solicitation of voters at the polls, the challenging of votes, the manner of conducting elections, of counting the ballots and making return thereof, *and all other kindred subjects,* shall apply to all primaries in so far as they are consistent with this act, the intent of this act being to place the primary under the regulation and protection of the laws now in force as to elections."

The intention to import into the primary law all provisions of the general laws relative to the canvassing of the returns, not inconsistent with special provisions of the primary law, cannot be mistaken. Turning to the general statutes we find that the subject of the county canvass is covered by secs. 81 to 88, inclusive, Stats. 1898. Sec. 81 provides for the meeting of the board and of whom it shall be composed; sec. 82 provides for the opening of the returns and the procurement of amended returns in case of informalities or defects; secs. 83 and 84 provide for the actual canvass, the determination of results, the making of a certified statement of such results, and the publication thereof; sec. 85 requires the clerk to immediately make out a certificate of election for each successful candidate and deliver the same to him on application; secs. 86 and 87 provide for the making of duplicate statements as to other than county officers; and sec. 88 provides for the canvass of the returns upon a proposed constitutional amendment or other question submitted to the people. These are the provisions governing the county canvass of the returns of a November election, and the primary law says that the canvass of the returns of the primary election shall be made by the same officers and in the same manner; and, further, that the provisions of the general statutes relating to the conduct of elections, the counting of ballots, the making of returns, and *all other* kindred subjects shall apply to primary elections. Is the execution and delivery of a certificate of election to the

successful candidate one of the provisions thus imported into
the primary law? The county clerk so construed the law in
the present instance, and we think rightly. We think it quite
clear, from inspection of the general statutes, that the legisla-
ture regarded the execution of the certificate of election as an
integral part of the county canvass. The section providing
for it is included within the subdivision of ch. 5, Stats. 1898,
which bears the heading "County Canvass." The execution
of the certificate is an act which might well be done by the
whole board, and in many jurisdictions is so done; but even
though not required to be done by the whole board, it is re-
quired to be done by the county clerk, who is, when able to
act, required to be a member of the board. It is also required
to be done *immediately* upon the execution of the certified
statement of results and apparently as the necessary final act
attendant upon that result. As we have seen, the necessary
effect of the primary law is to give an official character and
standing to a man who has received the plurality of the votes
of his party at a primary election. It may not be strictly
accurate to call him a public officer, but the law gives him a
certain and definite legal standing and endows him with at
least one valuable privilege or right which he may enforce.
Until the time of the election he is guaranteed, and in fact
holds, a recognized legal position, which may be called, in de-
fault of a better term, a *quasi* office, namely, that of a nomi-
nated candidate. The giving of a certificate of election to a
man who has received the necessary plurality at a primary
election, upon the determination of that fact by the proper
board, is entirely logical; in fact, just as logical as the giving
of a certificate of election to a man who has received the ma-
jority of the votes for an ordinary office. His rights under it
are not so valuable and last a shorter time, but they are sub-
stantial. In view, therefore, of the provisions of the general
statutes which make the execution of the certificate a part of
the county canvass, and the very sweeping sections which in-

corporate, these provisions into the primary law, we conclude that the law contemplates the execution of a certificate of election to the duly nominated primary candidate.

From this conclusion it naturally follows that such a certificate must be given like effect, so far as the rights of a nominated candidate are concerned, as a certificate of election to an ordinary office. This court has held that one who has been declared by the proper canvassing board to have been elected to an office, and has received the proper certificate of election and duly qualified, is entitled to the possession of the office and its property and emoluments as against all the world except a *de facto* officer already in possession under color of authority, and that this right persists until a different result is reached in a *quo warranto* action or other proper proceeding to contest the right of the certificate holder. *State ex rel. Jones v. Oates,* 86 Wis. 634, 57 N. W. 296; *State ex rel. McCoale v. Kersten,* 118 Wis. 287, 95 N. W. 120. If this principle be applied to the present case, and we see no reason why it should not be so applied, it is decisive in favor of *Rinder's* right to have his name placed upon the ticket. No act of qualification is required of a candidate nominated at a primary election. So, when the vote has been canvassed by the proper board and he has received his certificate, he is at once in possession of his *quasi* office so far as any one can be in possession of it, and entitled to its single privilege, namely, the right to have his name put on the official ballot in the proper place, as against all the world, until in some proper action or proceeding to contest his right it is decided that another person was in fact nominated. It is not necessary now to decide what action might be brought to contest his *prima facie* right. No reason is perceived why *quo warranto* proceedings would not be the proper remedy; but it is sufficient to say that no action of any kind has been brought or is pending to test the relator's *prima facie* title. Nor is it seen how any voluntary action of the canvassing board in coming together

again and attempting to rescind their former action and bestow the title to the office upon another can affect the relator's *prima facie* title to the *quasi* office of which he was in possession. It would hardly be claimed for a moment that the incumbent of an ordinary office, who had qualified and taken possession of it under a certificate of election, could be ousted of his right by a resolution passed at a second meeting of the canvassing board. He is not a party to the proceedings of the canvassing board, nor can such proceedings be called an .action or proceedings to contest an election. We are not now attempting to decide whether the canvassing board had any power to re-assemble and make a second canvass, or whether they could be compelled to do so by *mandamus*. These are questions concerning which there is some conflict in the decisions. 15 Cyc. 383, 384, and notes 89–91. We simply hold that, where a canvass has been made and a certificate issued, the certificate holder cannot be deprived of his *prima facie* right to the office by any subsequent.action of the canvassing board. His right must be contested and set aside in a proper action or proceeding brought for the purpose, and until this has been done *mandamus* will lie to place him in possession of the property and privileges of the office to which he has *prima facie* title. These considerations seem to us to demonstrate that the peremptory writ of *mandamus* should issue, requiring the county clerk to place the name of the relator upon the official ballot.

Before closing this opinion it seems not improper to say that the present case must serve to bring sharply to attention the fact that there is no provision made in the primary law for the speedy settlement of contests arising over primary elections. The frequency with which such questions are liable to arise is apparent, and the practical impossibility of settling them by means of ordinary processes of law in the courts, by reason of.the very limited time within which they must be settled, seems equally apparent. It would seem the

State ex rel. Rinder v. Goff, 129 Wis. 668.

part of legislative wisdom to provide some tribunal clothed with the power to entertain and finally decide in a speedy manner all such questions; otherwise, there is certainly danger of rights being lost and injustice done simply because no remedy is provided.

*By the Court.*—The demurrer to the return is sustained, and the peremptory writ of *mandamus* is adjudged to issue as prayed in the relation.  The *certiorari* proceedings are dismissed, without costs.